CASTILLO, et al., Plaintiffs,

v.

ENVOY CORPORATION, et al., Defendants.

No. 3:98–0760.

United States District Court, M.D. Tennessee, Nashville Division.

April 8, 2002.

466

Sheldon Albert, Jeffrey A. Barrack, Barrack, Rodos & Bacine, Philadelphia, PA, Richard H. Weiss, Robert Dumas, Milberg Weiss Bershad Hynes & Lerach LLP, New York City, George E. Barrett, Douglas S. Johnston, Jr., Timothy L. Miles, Barrett, Johnston & Parsley, Nashville, TN, Stanley M. Chernau, Chernau, Chaffin & Burnsed, PLLC, Nashville, TN, for plaintiffs.

Bob F. Thompson, Bass, Berry & Sims, Nashville, TN, Robert Jackson Walker, John M. Tipps, John C. Hayworth, Walker, Bryant & Tips, Nashville, TN, for defendants.

## MEMORANDUM ORDER

JOHN T. NIXON, Senior District Judge.

Pending before the Court is Plaintiffs' Motion for Class Certification and accompanying Memoranda (Doc. Nos.81–83), to which De-

fendants responded by filing a Memorandum in Opposition and supporting documents (Doc. Nos.89–91). Plaintiffs have also filed a Reply Memorandum and accompanying exhibits (Doc. No. 93 and 94.) For the reasons stated below, the Court will grant Plaintiff's Motion.

## I. BACKGROUND

Plaintiffs purport to represent a class of all persons who purchased shares of Envoy Corporation ("Envoy") from February 12, 1997 through August 18, 1998 (the "Class Period"). (Cmplt.¶ 1.) Envoy provides electronic data interchange and transaction processing services to participants in the health care market, and during this period its common stock was traded on the NASDAQ national market system. The individually named Defendants were or are senior executive officers and/or directors, shareholders, and controlling persons of Envoy during the relevant period. The Amended Complaint, Count I, alleges that Defendants violated Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 promulgated thereunder by the Securities Exchange Commission ("SEC"), which prohibit fraudulent and material misrepresentations in the sale or purchase of securities. Count II of the Complaint asserts a cause of action against Defendant McNamara under Sections 20(a), which provide for individual liability of "controlling persons" as defined in the Exchange Act and requires a finding of liability under Section 10(b). (Am.Cmplt.¶¶ 90–98.)

Plaintiffs claim that Defendants improperly recorded large, one-time write-offs for in-process research and development ("IPR & D") in connection with three acquisitions by Envoy. In March 1996, Envoy purchased National Electronic Information Corporation ("NEIC") for $93.4 million, allocating 32% of that purchase price to IPR & D. In 1997, Envoy purchased Diverse Software Solutions

("DDS") for $7 million, and Healthcare Data Interchange Corporation ("HDIC") for $51.2 millions, respectively writing off 43% and 68% of the total purchase price to IPR & D.[1] Plaintiffs' alleged violations center on how these acquisitions costs were recorded and the effect these figures had on Envoy's financial statements. Plaintiffs aver that the IPR & D write-offs were excessive and violated generally accepted accounting principles ("GAAP").

Allegedly, Defendants "knowingly and recklessly disseminated to the public a series of materially false and misleading statements, reports and other representations about Envoy's financial status" relating to the above mentioned write-offs, causing its stock to be "artificially inflated." (Doc. No. 82 at 2.) Plaintiffs also claim that this course of conduct "constituted a fraud on the market that continued through the close of trading on August 18, 1998." On that date, Envoy disclosed that the SEC was conducting an investigation into its accounting, which could have a "material adverse impact" on its reported past and future operating results.

Following Envoy's disclosure, its common stock plunged in one day from $35 to $22 per share. (*Id.* at 2–3.) The SEC inquiry also lead Defendants to restate the amount allocated to IPR & D and write it off immediately, and to reallocate portions the purchase amounts to goodwill, which is amortized over time. The present lawsuit ensued, and the case is presently before the Court on Plaintiff's Motion for Class Certification, pursuant to Fed.R.Civ.P. 23(a) ("Rule 23"). A hearing on this motion was held on November 5, 2001. (Doc. No. 105.)[2]

## II. LEGAL STANDARD

### A. Class Certification

▮ A class action will be certified only if, after "rigorous analysis," the court is satis-

---

**1.** This factual section relies mostly on a previous opinion in this case, which may be consulted for a more detailed explanation of the facts and procedural history leading to this Motion. *See In re Envoy Corp. Sec. Litig.,* 133 F.Supp.2d 647, 649 (M.D.Tenn.2001).

**2.** The case was originally assigned to the undersigned, but it was later closed. This Court granted Plaintiff' motion to administratively re-open

the case (Doc. No. 52), and the action was reassigned to the Hon. Judge Haynes, who conducted the November hearing. However, the Hon. Judge Haynes has recently recuse himself (Doc. No. 104), and the case was re-assigned to this Court once again. The undersigned has read the transcript of the November hearing and is familiar with all prior documents filed in connection with this Motion for Class Certification.

fied that the prerequisites of Rule 23(a) have been met and that the action falls within one of the categories under Rule 23(b). *Gen. Tel. Co. of Southwest v. Falcon,* 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982). However, courts cannot make a preliminary inquiry into the merits of the proposed class action. *See Eisen v. Carlisle,* 417 U.S. 156, 178, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974). The burden of establishing that all requirements have been satisfied is on the party seeking class certification. *See Thompson v. County of Medina,* 29 F.3d 238, 241 (6th Cir.1994). Under Rule 23(a) the following requirements must be satisfied:

(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a).

Rule 23(b)(3), the section relevant to this class certification, requires that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members; and that a class action [be] superior to any other available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3).

## B. Fraud on the Market

 Reliance is essential to § 10(b) and Rule 10b–5 securities fraud claims, because it "provides the requisite causal connection between a defendant's misrepresentation and a plaintiff's injury." *Basic, Inc. v. Levinson,* 485 U.S. 224, 243, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) (citations omitted). When a plaintiff alleges that a defendant made material misrepresentations or omissions concerning a security that is actively traded on an efficient market, thus establishing a fraud on the market, a rebuttable presumption of reliance arises. *See id.* at 247, 108 S.Ct. 978. The fraud-on-the-market theory rests on the assumption that in "an open and developed market, dissemination of material misrepresentations or withholding of material information typically affects the price of the stock, and purchasers generally rely on the price of the stock as a reflection of its value." *Peil v. Speiser,* 806 F.2d 1154, 1161 (3rd Cir.1986).

 Under the Sixth Circuit jurisprudence, there are five elements that a plaintiff is required to allege in order to invoke the fraud-on-the-market presumption of reliance:

(1) that the defendants made public misrepresentations, (2) that the misrepresentations were material, (3) the stock was traded on an efficient market, (4) that the misrepresentations would induce a reasonable, relying investor to misjudge the value of the stock, and (5) that the plaintiff traded in the stock between the time the misrepresentations were made and the time the truth was revealed.

*Levinson v. Basic, Inc.,* 786 F.2d 741 (6th Cir.1986), *vacated on other grounds, Basic supra.* Without the benefit of this presumption, "requiring proof of individualized reliance from each member of the proposed plaintiff class effectively would have prevented respondents from proceeding with a class action, since individual issues then would have overwhelmed the common ones." *Basic,* 485 U.S. at 242, 108 S.Ct. 978; *see also* Fed.R.Civ.P. 23(b)(3). Therefore, the applicability of the fraud-on-the-market theory is central to class certification in any securities fraud lawsuit.

## III. DISCUSSION

"Defendants do not contest Plaintiffs' motion for class certification as to the requirements of Rule 23(a)." (Doc. No. 89 at 6, Def. Resp.) [3] However, Plaintiffs also rely on Rule

**3.** Plaintiffs argue, and the Court agrees, that: (1) the numerosity requirement is met because as of August 1998, Envoy had more than 21 million shares of common stock outstanding, and is likely to include thousands of members, *see In re Am. Med. Sys., Inc.,* 75 F.3d 1069, 1079 (6th Cir. 1996)("[w]hen class size reaches substantial proportions, the impracticability requirement is usu-

ally satisfied by the numbers alone."); (2) there are common questions of fact and law, such as whether Envoy's statements misrepresented material facts, or whether Defendants knowingly or recklessly misrepresented these facts; (3) in order to obtain redress for injuries suffered by purchasing stock at an inflated price, Plaintiffs will have to prove the same facts under the same

23(b)(3) requiring a showing that common issues predominate and that a class action is the best method of adjudication, which are at the center of the dispute. Defendants argue that the presumption of reliance is not applicable, and that to recover on the fraud claims Plaintiffs will have to prove each of the proposed class members' individual reliance. Thus, individual reliance issues will predominate over issues common to the class, making certification inappropriate. (Doc. No. 89 at 6–7.) Relying on their expert's declaration, which concludes that the alleged misrepresentations had no measurable effect on Envoy's stock price (Doc. No. 90, Decl. Bradford Cornell), Defendants assert that they have rebutted the presumption. (*Id.* at 8.) [4]

Plaintiffs reject this argument on several grounds. First, since Envoy's shares traded in an open, developed, and efficient market, Plaintiffs are entitled to a presumption of reliance under *Basic*. Second, Defendants' argument improperly asks the Court to inquire into the merits of the suit to determine the materiality of the allegedly false and misleading statements. Third, even if the Court delves into the merits, certification is proper because Defendants' expert conclusions are incorrect as shown by Plaintiffs' expert (Doc. No. 94, Decl. Michael Marek.) Fourth, even if Plaintiffs are not entitled to the presumption, common issues will predominate over individual issues of law and fact. (Doc. No. 93 at 2–3.)

## A. The Predominance Requirement

Plaintiffs claim that "all purchasers of Envoy stock during the Class Period suffered similar injury through their purchase of shares at artificially inflated prices and a presumption of reliance applies." (Cmplt. at

¶ 82.) Defendants argue they have rebutted the presumption in this case, and thus, in the absence of the presumption, individual issues of reliance will predominate.

### 1. The presumption

The fraud-on-the-market theory is based on the notion that " 'the market is performing a substantial part of the valuation process performed by the investor in a face-to-face transaction. The market is acting as the unpaid agent of the investor, informing him that given all the information available to it, the value of the stock is worth the market price.' " *Basic*, 485 U.S. at 244, 108 S.Ct. 978 (*quoting In re LTV Securities Litig.*, 88 F.R.D. 134, 143 (N.D.Tex.1980)). The presumption "rests on the assumption that the price of an actively traded security in an open, well-developed and efficient market reflects all available information about the value of a company." *Freeman v. Laventhol & Horwath*, 915 F.2d 193, 197 (6th Cir.1990). Therefore, the presumption "arises only when there has been a fraud on an *efficient* market." *Id.* at 198 (emphasis added).

The *Freeman* Court explained that an efficient market is (1) an open market in which anyone can buy or sell, (2) a developed market is one which has a "high level of activity and frequency, and for which trading information (e.g., price and volume) is widely available," and (3) an efficient market is one "which rapidly reflects new information in price." *Id.* In this case, there is no dispute as to whether the Envoy securities traded in an efficient market. The stock was traded in an open market where anyone could buy or sell.[5] Envoy securities market was developed because throughout the Class Period

theories of liability, satisfying the typicality requirement, *see id.* at 1082 (a claim is typical if it arises from the same course of conduct giving rise to the claims of other class members); and (4) Plaintiffs' counsel do not have interests antagonistic to the class, counsel has experience prosecuting class actions and is able to adequately represent the class. (Doc. No. 82 at 5–10.)

4. Relying on *Basic*, 485 U.S. at 248, 108 S.Ct. 978 (stating that "[a]ny showing that severs the link between the alleged misrepresentation and either the price received (or paid) by plaintiff, or his decision to trade at a fair market price, will

be sufficient to rebut the presumption of reliance.")

5. *See In re Revco Sec. Litig.*, 142 F.R.D. 659, 662 (N.D.Ohio 1992) (holding that "[f]or purposes of a class certification motion, a court must accept as true the factual allegations contained in the complaint")(*citing Shelter Realty Corp. v. Allied Maint. Corp.*, 574 F.2d 656, 661 n. 15 (2d Cir. 1978); *Blackie v. Barrack*, 524 F.2d 891, 901 n. 17 (9th Cir.1975), cert. denied, 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976).)

the company had more than 16 million shares of common stock outstanding, where an average of more than 240,000 shares were traded each day. (Am. Cmplt. ¶¶ 15, 70, 85; Decl. Marek ¶¶ 20–23.)

Considering the five factors identified by the Sixth Circuit as pertinent to the question of efficiency, Envoy market of securities was efficient at the relevant time. *Freeman*, 915 F.2d at 199. First, the company's large weekly trading volume was more than 1,200,-000 shares and the average weekly turnover during the Class Period represented about 6.7% of the weighed-average number of outstanding shares. (Decl. Marek at ¶¶ 21–22.) Second, the company was actively followed by securities analysts at major brokerage firms, such as Salomon Smith Barney, Morgan Keegan & Co., and Credit Suisse First Boston. (*Id.* at ¶¶ 28–29.) Third, the number of market makers and arbitrageurs willing to trade in Envoy stock exceeded both the minimum threshold for listing on the NASDAQ system and the average number of market makers for other securities listed thereon. (*Id.* at ¶ 18.) Additionally, during the Class Period, Defendants filed a Form S 3 Registration Statement[6] relating to a public offering of common stock. (*Id.* at ¶ 26.) Finally, it seems as if unexpected corporate events or releases would immediately cause a movement in the stock price, such as the 36% decrease in the trading price, in just two days and on record volume, following the August 18, 1998 press release. (Am. Cmplt.¶¶ 70, 82.)

■ Therefore, for purposes of this motion for class certification, the Court finds

that Plaintiffs have met the threshold showing giving rise to the presumption of reliance, i.e. Envoy's stock was traded in "an open, well-developed and efficient market." *Freeman*, 915 F.2d 193, 197; *Basic, supra.* However, since the purpose of the reliance requirement is to establish a "causal connection between a defendant's misrepresentation and a plaintiff's injury," *id.* at 243, 108 S.Ct. 978, the presumption may be rebutted by a showing that the market did not respond to the alleged misrepresentations. *Semerenko v. Cendant Corp.*, 223 F.3d 165, 179 (3rd Cir. 2000).

Defendants in this case assert that they have rebutted the presumption of reliance in that manner, and argue that even if the Court is not allowed to review the merits of the case at this stage, the Court may nonetheless make "an initial determination as to the availability to Plaintiffs of the fraud-on-the-market presumption." (Doc. No. 89 at 9.) *See also O'Neil*, 165 F.R.D. at 498 (holding that "the court can and must conduct a preliminary inquiry into the likely availability of the fraud-on-the-market theory in order to determine whether common issues will truly predominate.") But Plaintiffs argue that Defendants are attempting to adjudicate the merits of their claims, in contravention of *Eisen's* admonition that "nothing in either the language or history of Rule 23[ ] gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action." 417 U.S. at 177, 94 S.Ct. 2140.

■ The Court is hereby asked to walk the fine line[7] created by the Supreme Court

---

6. An S–3 Statement is an abbreviated disclosure form that is only used by "corporations whose stocks are actively traded and widely followed." *O'Neil v. Appel*, 165 F.R.D. 479, 502 (W.D.Mich. 1996). The SEC's rational for the integrated disclosure used in Form S–3 is that the " 'form is predicated on the Commission's belief that the market operates efficiently for these companies, i.e., that the disclosure in Exchange Act reports and other communications by the registrant, such as press releases, has already been disseminated and accounted for by the market place.' " *Cammer v. Bloom*, 711 F.Supp. 1264, 1284 (D.N.J.1989) (quoting SEC Securities Act Release No. 6331, 46 FR 41,902, *reprinted in* Fed.Sec.L. Rep. (CCH) Spec. Regs. No. 926 (Aug. 13, 1981).)

7. *See e.g.*, exchange between Defendants' counsel, and the Hon. Judge Haynes:

... In determining the propriety of a class action, the question is ... whether the requirements of Rule 23 are met. That's all *Eisen* said about it. And this judge—
THE COURT: Yes, but you could make that determination without getting into whether basically the presumption has been overcome and rebutted.

MR. WALKER: You don't have to decide at this juncture the merits of the presumption issue.
THE COURT: But isn't that indirectly what I'm saying? Isn't that indirectly what Judge Scoville [*O'Neil, supra*] is saying?

decisions in *Eisen supra*, which instructs courts to avoid a finding on the merits, and *Basic*, which some judges have interpreted as instructing the courts to review the availability of the presumption prior to certifying a class, to prevent individual issues from overwhelming common ones, 485 U.S. at 242, 108 S.Ct. 978. However, after reviewing Defendants' arguments, *infra*, the Court concludes that a preliminary determination as to the "availability" or applicability of the presumption, which is distinct from its actual application, can be made at this stage without dealing with the merits of the case.[8]

### 2. *Rebuttal of the Presumption*

Based on the Declaration of their expert Mr. Cornell, Defendants argue that the statistical analysis conducted by their expert shows that none of the releases or filings, which Plaintiffs assert caused Envoy's stock price to be inflated, had a statistically significant effect on the stock price. (Doc. No. 89 at 12); (Doc. No. 90, Decl.Cornell). Defendants assert that the drop in stock price in August 18, 1998, when Envoy announced the SEC was questioning some of its IPR & D write-offs, did not demonstrate a prior artificial inflation in the stock price as the press release "did *not* reveal that those prior practices were mistaken and it did *not* contain any corrections to prior financial results." (*Id.* at 13–14.) They explain that the market was merely reacting to the announcement of a government inquiry, commonly interpreted as "bad news." (*Id.* at 14.)

To further support the argument, Defendants explain it was not until November 16, 1998, that Envoy actually restated certain prior financial results to reflect decreased write-offs and increased goodwill amortiza-

tion. (*Id.*) Indeed, the November press release resulted in an increase in the stock price to $39.94, which Defendants note was higher than the $35.81 at closing on August 17, 1998. (Decl. Cornell at ¶ 23.) Finally, Defendants assert that "financial theory holds that the market values companies on the basis of their free cash flows," and thus, since IPR & D and goodwill are both non-cash accounting charges, the correction of these charges should not have affected the stock value. (Doc. No. 89 at 15.)

■ Therefore, Defendants assert they have rebutted the presumption of reliance, and absent such presumption, class certification is not appropriate because individual issues of reliance will predominate over common issues. (Doc. No. 89 at 16–19.) However, the Court agrees with Plaintiffs' assertion that Defendants are improperly reaching the merits of the case.

Defendants heavily rely on *O'Neil v. Appel*, where Judge Scoville accepted defendants' expert analysis and denied certification after concluding that the fraud-on-the-market presumption would likely be unavailable. 165 F.R.D. at 499–506. However, the issue in *O'Neil* was "whether plaintiffs [would] likely be entitled to invoke the presumption of reliance" and the court clearly stated it was "not required at [that] point to decide the merits of plaintiffs' fraud-on-the market theory." *Id.* at 499–500. Accordingly, after a review of the record under the factors set forth in *Freeman, supra*, the *O'Neil* court denied certification, finding that the relevant market exhibited "none of the attributes of an 'efficient' market." *Id.* at

---

MR. WALKER: I do not believe is it, Your Honor. And if you go on and see what he did, he went into a rigorous analysis of all the facts that were presented.... But he spent some several pages after that going into a deep analysis of this, as did the judge in *McEwen v. Digitran* ...
THE COURT: But if I accept your experts affidavits, how do I avoid passing on the merits? ...
MR. WALKER: The way to avoid it is, you're not passing on the merits in this hearing today.
THE COURT: yes, but—I may say it, but that's actually what I'm doing....
THE COURT: Why should I be making this significant decision without a full record ...

MR. WALKER: I'll tell you why I think ... this is what *Basic* says, ... (Doc. No. 105 at 17–19.)

8. As the Hon. Judge Haynes explained during the class certification hearing on this case, "when you read them together [Rule 23(a) and (b)], that seems to me what they are saying in terms of taking a *peek into the merits* of the case ... But that's my distinction between giving a peek at the merits and then *making actually a selection of which theory* I believe in light of the evidence presented." (Doc. No. 105 at 24) (emphasis added).

504. Thus, this case is inapposite here.[9]

At a hearing on this matter, Defendants also relied on *McEwen v. Digitran Systems, Inc.*, for the proposition that the Court should determine whether they rebutted the presumption. *See supra* n. 7. *McEwen* purports to go further than this Court finds is required under *Eisen* and *Basic*, to address not only the "applicability of the fraud-on-the-market theory," but also "whether the defendants have proffered evidence sufficient to rebut that burden." 160 F.R.D. 631, 639 (D.Utah 1994). The court summarily found that Digitran's market of shares was efficient and that the information withheld was material, thus finding the presumption was available. *Id.*

Then, the court reviewed defendants' assertion that the alleged misrepresentations did not affect Digitran's stock price. *Id.* The plaintiffs argued the market does not react to information it already anticipates. *Id.* at 640. The *McEwen* court stated the following:

At this stage of the proceeding, the Court cannot categorically determine whether the alleged misrepresentations and omissions had an effect upon the market price ... Since the market does not react to information which it expects, and because complicated questions of causation are bet-

ter left until trial, the Court concludes that plaintiffs have satisfied their burden of proving an effect upon the market price for purposes of establishing the applicability of the fraud-on-the-market theory. *Id.*

Although the *McEwen* court concluded that defendants had failed to rebut the presumption and granted certification; this Court finds that any review of the effect of the misrepresentations upon the stock price and their materiality, was merely cursory and within the limits set forth by *Eisen.*[10]

Defendants here attempt to have the Court adjudicate issues of materiality and causation, which go to the merits of the action. Even if the Court reaches as far as the *McEwen* court did, the conclusion still is that Plaintiffs have shown the applicability of the presumption of reliance for purposes of this motion for class certification. First, even accepting Defendants' conclusion that the lack of statistically significant *movement* of the stock price following each misrepresentation shows that the IPR & D accounting did not artificially inflate the stock price (Cornell Decl. at ¶¶ 15–20), such conclusion does not address whether the misstatements caused the stock to be "artificially *maintained* at a level that did not reflect its true value."

---

9. *See also Yadlosky v. Grant Thornton L.L.P.*, 197 F.R.D. 292, 297 (E.D.Mich.2000) (explaining that the record showed the "securities at issue [there] were not sold in an open and efficient market"), which is also inapposite. Finally, Defendants also heavily relied on *Semerenko, supra*, which dealt with a 12(b)(6) motion to dismiss, and thus is not relevant to this procedure. 223 F.3d at 180 (noting that "defendants suggest that the market did not incorporate the alleged misrepresentations into the price of ABI common stock ... While those arguments are facially appealing, we do not find them persuasive given the procedural posture of this case.")

10. This Court disagrees with some courts' conclusion that *Basic* has partially overruled *Eisen*. *See e.g., In re Seagate Tech. II Sec. Litig.*, stating that:

Given the relative recency of the decision in *Basic*, the court concludes that the *Eisen* rule prohibiting examination of the merits during the class certification process must yield. By adopting the fraud-on-the-market theory, the *Basic* court implied, though perhaps unintentionally, that the district courts must examine some of the merits. Because of the potential

for conflicts created by the fraud-on-the-market theory and the out-of-pocket measure of damages, the adequacy of the representation cannot be ascertained without examining the composition of the class.

843 F.Supp. 1341, 1367 (N.D.Cal.1994); *see also O'Neil*, 165 F.R.D. at 497 (quoting *Seagate* favorably). It rather joins the majority of courts that have criticized that view. *See e.g., Picard Chem., Inc. Profit Sharing Plan v. Perrigo Co.*, Case Nos. 1:95–CV–141, 1:95–CV–290, 1996 WL 739170, *6, 1996 U.S. Dist. LEXIS 16330, *26 (W.D.Mich. Sept. 27, 1996)("joining the majority of courts which have rejected the analysis set forth in *Seagate II* "); *Freedman v. Louisiana–Pacific Corp.*, 922 F.Supp. 377 (D.Or.1996); *In re Mut. Sav. Bank Secs. Litig.*, 166 F.R.D. 377, 383–84 (E.D.Mich.1996); *Welling v. Alexy*, 155 F.R.D. 654, 661–62 (N.D.Cal.1994), all criticizing *Seagate II. See also Hemming v. Alfin Fragances, Inc.*, 1990 WL 106997, *4, 1990 U.S.Dist. LEXIS 9193, *12; Fed. Sec. L. Rep. (CCH) P95, 380 (S.D.N.Y. July 25, 1990) ("Any inquiry into the merits of plaintiff's claim in a motion for class certification is forbidden by law. *Eisen, supra* ").

(Doc. No. 93 at 19.)[11] Second, Defendants also emphasize the fact that the stock dropped following the August release while increasing in price after the correction in the financial statement was announced in November. *See supra* at 471.[12] However, the August 18, 1998 press release announced:

> The Company and its auditors, Ernst & Young LLP, believe that the allocation and related amortization charges are in accordance with generally accepted accounting principles. Nevertheless, if there are any significant changes as a result of these discussions ... these could have a *material impact* on the related noncash charges reflected in the Company's financial results for the six months ended June 30, 1998, and the years ended December 31, 1997 and 1996, and *could materially affect future results of operations* as a result of the increased amortization expense.

*Business Wire* (Aug. 18, 1998), *at* http://www.businesswire.com (emphasis added). Thus, even if it did not restate financial results, the release provided enough information for a market-correction of any prior artificial inflation of the stock price, in anticipation to Envoy's actual correction. (Decl. Marek at ¶¶ 48–53.) Accordingly, that would explain the lack of a downward movement of the stock when the financial results were actually corrected, given that the information released on November 16, 1998 had "already [been] anticipated." *McEwen*, 160 F.R.D. at 640.

Finally, the experts also have different, but plausible, interpretations regarding the cause of the increase in the stock price in November, 1998, and Plaintiffs' expert argues that Mr. Cornell's declaration "fails to take account of any non-litigation related information release by the Company that may have caused the price of Envoy stock to rise (i) on November 17, 1998 and (ii) between August 18 and November 16, 1998, including for example, Envoy's October 21, 1998 announcement of better-than-expected earnings which drove Envoy's share price up by $8.625, or more than 38%, on October 21 and 22. Marek Decl. ¶¶ 46, 58–60." (Doc. No. 93 at 22.) Therefore, as in *McEwen*, Defendants' proof does not clearly rebut the presumption, but it rather creates a factual dispute as to the materiality of the excessive IPR & D write-offs and the effect of these and the consequent corrections on the stock price, which as the *McEwen* court wisely stated are "complicated questions of causation [ ] better left until trial," and at the earliest a summary judgment proceeding. 160 F.R.D. at 640.[13] The Court concludes that Plaintiffs have met the predominance requirement under Rule 23(b)(3) and the Court finds that, under the fraud-on-the-market theory, *common* issues of reliance will predominate.[14] Lastly, even

---

**11.** *See also Nathenson v. Zonagen*, 267 F.3d 400, 419 (5th Cir.2001)(acknowledging that false statements may not initially affect the stock price if that equates the market's expectation).

**12.**

| | Dates | Events | Stock price | Change |
|---|---|---|---|---|
| Class Period | 02/12/97 | Release 1996 financial results | | |
| | 08/17/98 | | $ 35.81 | |
| End C.P. | 08/18/98 | SEC inquiry and potential restatement announced | $ 26.50 | ($ 9.31) |
| | 08/19/98 | | $ 22.81 | ($ 3.69) |
| | October | —— | —— | —— |
| | 11/16/98 | Actual restatement, end SEC inquiries announced | $ 32.44 | |
| | 11/17/98 | | $ 39.94 | $ 7.53 |

**13.** *See also Rodolico v. Unisys Corp.*, 199 F.R.D. 468, 473 (E.D.N.Y.2001) (stating "the Court should not resolve any material factual disputes" on a motion for class certification, and quoting *Eisen* ); *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297, 308, 311 (E.D.Mich.2001) ("[a]t this stage, the Court should not delve into the merits of an expert's opinion or indulge 'dueling' between opposing experts.")

**14.** *See also Basic*, 485 U.S. at 242, 108 S.Ct. 978 (citing approvingly the district court's findings that "the presumption of reliance created by the fraud on the market theory provide[s] 'a practical resolution to the problem of balancing the substantive requirement of proof of reliance in securities cases against the procedural requisites of [Fed. Rule Civ. Proc.] 23.' ")

if Plaintiffs can prove that questions of law and fact common to all members of the class will predominate over questions only affecting individual members, the class action has to prove superior to other kinds of adjudication before certification is granted. Fed.R.Civ.P. 23(b)(3).

### B. Superiority of the Class Action Form of Adjudication

 Courts have generally considered that class actions are the most favorable means of adjudicating federal securities fraud claims. *See e.g., Basic, Inc.,* 485 U.S. at 250, 108 S.Ct. 978; *Freedman v. Louisiana–Pacific Corp.,* 922 F.Supp. 377, 400–01 (D.Or.1996). Furthermore, because the potential class members "seek a determination on essentially the same issues, ... a class action would enhance judicial economy and efficiency." *Id.* In this case, the proposed class consists of thousands of members. Considering the potential class size, the relative small claims of many class members and the high cost of pursuing this litigation, the Court finds that trying the claims of these shareholders in a single action is superior to forcing the class members to try their claims separately. *See In re AmeriFirst Sec. Lit.,* 139 F.R.D. 423, 435 (S.D.Fla.1991)(class action most efficient to try claims of at least 1,000 class members). Accordingly, this Court finds that Plaintiffs have satisfied the superiority requirement of Fed.R.Civ.P. 23(b)(3).

### IV. CONCLUSION

The Court has conducted a "rigorous analysis" of the requirements under Rule 23, *Falcon,* 457 U.S. at 161, 102 S.Ct. 2364, going beyond the pleadings to review the parties' expert reports and holding a hearing on the matter, "in order to make a meaningful determination of the certification issues." *Castano v. Am. Tobacco Co.,* 84 F.3d 734, 744 (5th Cir.1996) (citation omitted); *In re Am. Med. Sys., Inc.,* 75 F.3d at 1079 (stating that

a hearing may be necessary). The Court hereby GRANTS Plaintiffs' Motion for Class Certification pursuant to Fed.R.Civ.P. 23(a) and (b)(3). *Craft v. Vanderbilt,* 174 F.R.D. 396, 401 (M.D.Tenn.1996) (certification in the framework of Rule 23 is within the discretion of the district court).[15]

The Court hereby CERTIFIES a Class including all persons or entities who purchased Envoy's stock during the period of February 12, 1997 through and including August 18, 1998; but excluding Defendants, subsidiaries and affiliates of the Company, members of the immediate families of any excluded person, any entity in which any excluded person has a controlling interest, and the legal representatives, affiliates, heirs, successors, predecessors in interest, or assigns of any Defendant. Furthermore, this Court CERTIFIES Plaintiffs James E. Jackson, Robert Schneider and Mark W. Spates to represent the Class.

It is so ORDERED.

---

15. Even after certification is ordered a class may be modified in light of new developments. *See Falcon,* 457 U.S. at 160, 102 S.Ct. 2364. Rule 23(c)(1) allows a class to be altered or amended at any time before a decision on the merits, while rule 23(c)(4) allows a court, when appropriate, to divide a class into subclasses. Fed.R.Civ.P. 23(c)(1), (4); *see also Forbush v. J.C. Penney Co.,* 994 F.2d 1101, 1106 (5th Cir.1993) ("courts retain substantial discretion in managing cases and ... the district judge may of course take measures, such as redefining the class and creating subclasses.")