In re EMPYREAN BIOSCIENCE, INC. SECURITIES LITIGATION

No. 02 CV 1439.

United States District Court, N.D. Ohio, Eastern Division.

Feb. 26, 2003.

***Memorandum of Opinion and Order***

GAUGHAN, District Judge.

### INTRODUCTION

This matter is before the Court upon Defendants' Motion to Dismiss the Consolidated Amended Class Action Complaint (Doc. 16). This case arises out of alleged securities violations asserted by shareholders of Empyrean Bioscience, Inc. For the following reasons, defendants' Motion is GRANTED without prejudice as to counts one, two and four. However, plaintiffs are hereby granted LEAVE TO AMEND the Complaint in order to comply with the heightened pleading standards contained in the PSLRA. Count three, however, is DISMISSED with prejudice.

### FACTS

This action is brought on behalf of plaintiffs, a class of shareholders[1], against corporate defendant, Empyrean Bioscience, Inc. (hereafter "Empyrean"), and individual defendants, Stephen D. Hayter, Richard C. Adamany, Lawrence D. Bain, Michael Cicak, Robert G.J. Burg, II, Andrew J. Fishleder and Bennett S. Rubin (collectively, hereafter "Individual Defendants"), alleging securities fraud. It appears from the Complaint that each of the Individual Defendants is or was a member of the board of directors of Empyrean.

For the purpose of ruling on defendants' Motion, this Court accepts as true the allegations contained in plaintiffs' Complaint.

Empyrean is a publicly traded company that develops and sells microbicidal products, including hand sanitizers. Empyrean claims to be developing a product known as GEDA–Plus, which is a contraceptive gel that prevents pregnancy and the

---

1. This Court has not certified a class of plaintiffs. Accordingly, at this stage, plaintiffs are suing solely in their own right.

spread of sexually transmitted diseases, including the AIDS virus.

Throughout the class period [2], Empyrean issued a number of press releases and SEC filings [3] related to the development, testing and approval of GEDA–Plus. Plaintiffs claim that certain statements contained in these documents were fraudulent. Although plaintiffs set forth the content of each statement in the 132 paragraph Complaint, the Court sets forth the content in summary form for the purposes of the statement of facts. The Court will address the content of each statement in more detail as needed in the analysis section.

According to plaintiffs, Empyrean falsely stated the following in press releases and/or SEC filings:

- GEDA–Plus gel had been chosen and accepted for testing by the National Institute of Allergy and Infectious Diseases (hereafter "NIAID"), a division of the National Institute of Health (hereafter "NIH")
- GEDA–Plus was under a Phase II clinical trial, which was funded by the NIH.
- An 18 month clinical trial was in its final stages of patient testing and would be submitted to the Mexican government for approval.
- GEDA–Plus successfully completed FDA Phase II clinical trials and had been approved by the FDA to enter Phase III trials. The Phase III trials were to be conducted by the NIH and were to begin in 1999.

- GEDA–Plus had been accepted by NIH to undergo Phase III clinical trials and the first two phases were completed with seemingly positive results. Although the Phase I and Phase II trials were not conducted by NIH, NIH confirmed the results.
- Confirmations of the Phase I and Phase II trials, as well as the Phase III study would be funded by NIH.
- Empyrean believed GEDA–Plus could be the first such product available for sale; it was the only product of several under investigation to be scheduled for human testing by the NIH.
- Phase III trials on GEDA–Plus had commenced in Brazil.
- The application process to obtain an investigational new drug ("IND") number was underway.
- IBC agreed to fund clinical trials for the gel, with a commitment to invest up to $10,000,000.
- Empyrean had received funding, which would assist Empyrean as it planned the worldwide distribution of GEDA–Plus.

According to the Complaint, these statements are false. The FDA never approved GEDA–Plus for clinical testing. Empyrean did not submit an IND application until the second half of 2000 and that application was not accepted by the FDA. The FDA indicated to IBC [4] that additional pre-clinical information would be required before an IND number would be issued. IBC never responded to the

---

**2.** Plaintiffs define the class period as May 6, 1998, through December 7, 2001.

**3.** The Individual Defendants each signed at least one SEC filing.

**4.** Although the Complaint contains numerous references to "IBC", there are no allegations outlining IBC's role in the development and

testing of GEDA–Plus. The Complaint also vaguely alleges that an entity known as Parexel was involved in aspects of GEDA–Plus testing. Although not specifically alleged in the Complaint, it appears that Empyrean had a licensing agreement with IBC, pursuant to which IBC was to oversee at least certain aspects of the testing and trials.

FDA's request and at no point did the FDA approve an IND number for GEDA–Plus. As a general rule, the NIH will not agree to fund or participate in clinical trials for a product absent an IND number. According to the Complaint, the NIH did not accept GEDA–Plus for testing and never validated the results of the Phase I and II trials. At no point did the NIH agree to conduct, sponsor or fund Phase III trials or the confirmation of Phase I and II trials. Nor did Empyrean ever conduct or complete any Phase III trials in Mexico or Brazil. As a result of the lack of testing, it was impossible for Empyrean to introduce GEDA-plus to consumers any time in the near future.

By late 2000, Empyrean was aware that a company controlled by IBC's president was under investigation for securities fraud in connection with the unregistered sale of securities and false statements surrounding the development and ownership of certain computer technology. Empyrean's 2001 annual report indicated that "Empyrean and two of its directors received and responded to subpoenas from the SEC seeking documents and other information related to an investigation of IBC. . . . The two directors gave testimony to the SEC in December 2001." In addition to alleging Empyrean's awareness of IBC's SEC investigation, plaintiffs allege that IBC did not have sufficient assets or capital to fund the testing of GEDA–Plus, as represented by Empyrean.

The Complaint asserts four claims. Count one alleges a violation of Section 10(b) of the Exchange Act and Rule 10b–5 of the Securities and Exchange Commission against all defendants. Count two alleges a violation of Section 20(a) of the Exchange Act against the Individual Defendants. Count three is asserted against all defendants for violation of Section 11 of the Securities Act. Count four is asserted against the Individual Defendants for violation of Section 15 of the Securities Act.

Defendants move to dismiss the Complaint. Plaintiffs oppose defendants' Motion.

### STANDARD

When considering a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the allegations of the complaint must be taken as true and construed liberally in favor of the plaintiff. *Lawrence v. Chancery Court of Tenn.*, 188 F.3d 687, 691 (6th Cir.1999). The complaint is not to be dismissed "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). *See also Hammond v. Baldwin*, 866 F.2d 172, 175 (6th Cir.1989). Notice pleading requires only that the defendant be given "fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley*, 355 U.S. at 47, 78 S.Ct. 99. However, the complaint must set forth "more than the bare assertion of legal conclusions." *Allard v. Weitzman (In Re DeLorean Motor Co.)*, 991 F.2d 1236, 1240 (6th Cir.1993).

"In practice, a . . . complaint must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under *some* viable legal theory." *Scheid v. Fanny Farmer Candy Shops, Inc.*, 859 F.2d 434, 436 (6th Cir. 1988) (quoting *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101 (7th Cir.1984)). Legal conclusions and unwarranted factual inferences are not accepted as true, nor are mere conclusions afforded liberal Rule 12(b)(6) review. *Fingers v. Jackson–Madison County General Hospital District*, 101 F.3d 702, 1996 WL 678233 (6th Cir. 1996), *unpublished*. Dismissal is proper if the complaint lacks an allegation regarding a required element necessary to obtain

757

relief. *Craighead v. E.F. Hutton & Co.*, 899 F.2d 485, 489–490 (6th Cir.1990).

Where the Complaint contains allegations sounding in fraud, Fed. R. Civ. Pro. 9(b) requires that such allegations be plead with specificity. "Despite the application of the Rule 9(b) heightened pleading requirement to securities fraud cases, the Supreme Court recognized long ago that 'litigation under Rule 10b–5 presents a danger of vexatiousness different in degree and kind from that which accompanies litigation in general.'" *Hoffman v. Comshare*, 183 F.3d 542, 548 (6th Cir.1999) (*quoting Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 739–44, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975)). In response to such concerns, Congress enacted the Private Securities Litigation Reform Act (hereafter "PSLRA"), further heightening the pleading standard a plaintiff must meet in order to avoid dismissal. While the PSLRA was designed to protect defendants from frivolous litigation, *Helwig v. Vencor, Inc.*, 251 F.3d 540, 547 (6th Cir. 2001), it was not intended to be a "choke point" preventing the prosecution of legitimate claims. *In re Federal–Mogul Corp. Securities Litigation*, 166 F.Supp.2d 559, 561 (E.D.Mich.2001).

## *ANALYSIS*

### Count One (Section 10(b) and Rule 10b–5)

To prevail on a claim brought pursuant to Section 10(b)/Rule 10b–5, a plaintiff must establish "(1) a misrepresentation or omission, (2) of a material fact, (3) made with scienter, (4) justifiably relied on by plaintiffs, and (5) proximately causing them injury." *Helwig*, 251 F.3d at 554 (*citing Aschinger v. Columbus Showcase Co.*, 934 F.2d 1402, 1409 (6th Cir.1991)).

The PSLRA, however, affords a defendant protection from abusive shareholder suits in two relevant ways. First, the PSLRA contains a heightened pleading standard beyond Rule 9(b)'s particularity requirement, which must be satisfied in order to avoid dismissal. In addition, the PSLRA contains a "safe harbor" provision exempting "forward-looking" statements from liability.

Defendants claim that the Complaint fails to state a claim under Section 10(b) of the Exchange Act and Rule 10b–5 of the Securities and Exchange Commission because plaintiffs fail to plead fraud as required under the PSLRA. In addition, defendants claim that their "forward-looking" statements are not actionable. Plaintiffs maintain that the Complaint adequately pleads fraud. Plaintiffs further argue that the asserted forward-looking statements are actionable. According to plaintiffs, even if this Court finds that the forward-looking statements are not actionable, defendants' other misstatements are actionable because they are statements of current or historical fact.

Each argument will be addressed in turn.

### 1. Heightened Pleading Standard

### A. False Statements

Defendants claim that the Complaint fails to adequately plead fraud because plaintiffs summarily conclude that the assertions by Empyrean are false, without providing a sufficient factual basis for an allegation of falsity. Defendants argue that because plaintiffs allege fraud based on "information and belief," plaintiffs must state with particularity all facts upon which such belief is based, including citation to documentary evidence and/or a description of the personal sources on which plaintiffs rely. Plaintiffs claim that the Complaint contains a sufficient basis for the assertion that the statements made by defendants are false. Plaintiffs argue that they need not identify documentary evidence or reveal their confidential sources in order to satisfy the PSLRA's pleading requirements.

With respect to false statements, the PSLRA requires,

(1) Misleading statements and omissions In any private action arising under this chapter in which the plaintiff alleges that the defendant-

(A) made an untrue statement of a material fact; or

(B) omitted to state a material fact necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading;

the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. § 78u–4(b)(1) (hereafter "Section (b)(1)").

On its face, the PSLRA requires a plaintiff to set forth each fraudulent statement as well as the reasons why the statement is fraudulent. Where the allegations are based "on information and belief," the plaintiff must identify with particularity all facts on which that belief is based. Courts interpreting this provision of the PSLRA have held that the particularity requirement may be met by including allegations referring to documentary evidence or a "general description of the personal sources" on which the plaintiff's belief is based. *Helwig*, 251 F.3d at 557 n. 4; *Fidel v. AK Steel Holding Corp.*, 2002 WL 31545952 (S.D.Ohio Sept.19, 2002) ("Of even greater concern, however, is plaintiffs' glaring omission of either 'documen-

tary evidence' or a 'sufficient general description of the personal sources of [their] beliefs.' "). *See also Novak v. Kasaks*, 216 F.3d 300, 314 (2nd Cir.2000) ("a complaint can meet the new pleading requirement imposed by paragraph (b)(1) by providing documentary evidence and/or a sufficient general description of the personal sources of the plaintiffs' beliefs."). A plaintiff need not, however, specifically name confidential sources provided the facts pled "provide an adequate basis for believing that the defendants' statements were false." *Id.* at 314.

Because plaintiffs affirmatively state that the allegations contained in the Complaint are made "upon information and belief..., based upon an investigation by [plaintiffs'] counsel that included a review of the public documents and news releases of Empyrean BioScience, Inc.," the Court finds that Section (b)(1) requires that plaintiffs state with particularity all facts on which their beliefs are based.

Upon review of the Complaint, the Court finds that plaintiffs fail to satisfy the particularity standard set forth in Section (b)(1). Although the Court finds that the Complaint does identify the particular statements contained in the SEC filings and press releases that plaintiffs claim are false, the Complaint does not set forth sufficient particular facts supporting the reasons why plaintiffs believe those statements to be false. For example, plaintiffs allege that Empyrean never conducted or completed any Phase III trials in Mexico. Plaintiffs also allege that no Phase III trials ever began in Brazil. Plaintiffs, however, fail to offer *any* facts in support of these allegations.[5] Instead, the Com-

---

**5.** This Court finds that the December 2001 press releases issued by Empyrean do not support plaintiffs' allegation that the statements regarding Phase III testing in Brazil were false. Those press releases indicate that one of the testing companies was no longer

performing work in connection with the Phase III trials, and that Empyrean had made oral and written inquiries to determine the status of the Phase III trials. (Compl.¶ ¶ 117, 118). The Court finds that these press releas-

plaint contains blanket conclusory allegations of falsity. (See e.g., Compl. ¶¶ 7, 48, 82, 86, 94, 98, 100, 104, 106). Similarly, plaintiffs allege that the NIH never agreed to fund trials for GEDA–Plus and never participated in clinical trials. To support their allegations of falsity, plaintiffs claim that no IND number was issued for GEDA–Plus and "as a rule, the NIH would not agree to fund or participate in clinical trials absent an IND number." (Compl. n. 3). Plaintiffs do not provide any underlying support for this assertion and, even if properly supported, plaintiffs fail to offer any factual support indicating that the NIH followed this rule in this case. In short, plaintiffs fail to properly allege the facts indicating that NIH did not fund or conduct trials with respect to GEDA–Plus.

In their brief, plaintiffs claim that the Complaint satisfies the specificity requirements of Section (b)(1), at least with respect to certain statements. Essentially, plaintiffs claim that many of the representations made by Empyrean concerning testing must be false because an application for an IND number was not made until late 2000 at the earliest, and the FDA rejected the application. Although plaintiffs' allegations in this respect do contain some factual support, i.e., plaintiffs specifically allege that the FDA rejected the application and requested additional information, the Court finds that the factual allegations lack the specificity required to satisfy Section (b)(1)'s heightened pleading standard. Plaintiffs fail to allege any basis for their knowledge and further fail to properly support any allegation that absent an IND number, the NIH or the FDA will not allow or approve testing.

By their own admission, plaintiffs' allegations are based on "information and belief." Nowhere in the Complaint do plaintiffs identify any basis for their knowledge. This Court, like the Court in *Fidel,* is

concerned with the "complete lack of either documentary evidence or a sufficient general description of the personal sources of plaintiffs' beliefs." *Fidel,* 2002 WL at 31545952 *14. Given the heightened pleading standard set forth in Section (b)(1), which evidences Congress's attempt to deter unsupported allegations of securities fraud, this Court finds that plaintiffs must provide additional specific, factual support for their allegations before proceeding against defendants.

### B. Scienter

Defendants claim that plaintiffs fail to plead facts giving rise to a strong inference of scienter. Plaintiffs disagree.

The PSLRA requires,

In any private action arising under this chapter in which the plaintiff may recover money damages on proof that the defendants acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

15 U.S.C. § 78u–4(b)(2) (hereafter "Section (b)(2)").

■ This provision changes the manner in which a Court must analyze scienter in the context of a 12(b)(6) motion, where the underlying claim alleges securities fraud. In *Helwig,* the Sixth Circuit adopted the First Circuit's approach to analyzing scienter on a motion to dismiss,

Congress has effectively mandated a special standard for measuring whether allegations of scienter survive a motion to dismiss. While under Rule 12(b)(6) all inferences must be drawn in plaintiffs' favor, inferences of scienter do not survive if they are merely reason-

es do not indicate that Phase III trials never commenced in Brazil.

able.... Rather, inferences of scienter survive a motion to dismiss only if they are both reasonable and 'strong' inferences.

*Helwig,* 251 F.3d at 551 (*quoting Greebel v. FTP Software, Inc.,* 194 F.3d 185, 196 (1st Cir.1999)). *See also, Federal–Mogul,* 166 F.Supp.2d 559. Thus, although inferences of fraud may be indulged, such inferences must be 'strong inferences,' leaving little room for doubt as to misconduct. *Helwig,* 251 F.3d at 553. This 'strong inference' requirement "means that plaintiffs are entitled only to the most plausible of competing inferences," not the "benefit of all reasonable inferences." *Id.*

■ Although the PSLRA changed the nature of what a plaintiff must allege in order to survive a motion to dismiss, Congress did not alter the nature of what constitutes scienter. *Id.* at 548 (*quoting Comshare,* 183 F.3d at 548–49). Thus, in addition to liability for intentional misrepresentations, "a defendant in an action for securities fraud may be liable for recklessness, that is, 'highly unreasonable conduct which is an extreme departure from the standards of ordinary care.'" *Helwig,* 251 F.3d at 550 (*quoting Mansbach v. Prescott, Ball & Turben,* 598 F.2d 1017, 1025 (6th Cir.1979)).

■ To determine whether plaintiffs' allegations taken as a whole raise a strong inference of scienter, the Court must apply a fact-intensive analysis. The following factors should be considered,

(1) insider trading at a suspicious time or in an unusual amount;

(2) divergence between internal reports and external statements on the same subject;

(3) closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information;

(4) evidence of bribery by a top company official;

(5) existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit;

(6) disregard of the most current factual information before making statement;

(7) disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication;

(8) the personal interest of certain directors in not informing disinterested directors of an impending sale of the stock;

(9) the self-interested motivation of defendants in the form of saving their salaries or jobs.

*Helwig,* 251 F.3d at 552 (*citing Greebel,* 194 F.3d at 196.).

While this list is not exhaustive, it provides a backdrop for this Court's analysis.

■ Upon review of the Complaint, this Court finds that plaintiffs' allegations fall far short of demonstrating a "strong inference" of scienter. As an initial matter, the Complaint is completely devoid of even a generalized allegation of scienter for the majority of the alleged misstatements. In their brief, plaintiffs claim that the allegations in the Complaint raise a strong inference of scienter because defendants "disregarded the most current factual information before making the statements." Notably, plaintiffs do not claim, nor do they allege, that any of the other factors listed above are applicable to this case. According to plaintiffs, the allegation that "the NIH rejected the application to conduct clinical trials" automatically renders every statement made by defendants concerning the NIH either a willful or reckless misstatement. This

Court disagrees. First, as set forth above, this Court finds that plaintiffs fail to properly set forth sufficient factual detail supporting their belief that the NIH rejected the application to conduct clinical trials. Even if plaintiffs' allegations were sufficient to allege falsity, plaintiffs fail to properly allege that defendants knew (or were reckless in not knowing) that the NIH rejected the application to conduct clinical trials for GEDA–Plus. In sum, plaintiffs simply rely on the allegation of falsity to allege scienter. To accept plaintiffs' argument that falsity alone demonstrates intent would essentially read the scienter requirement out of the statute.

With respect to the Brazilian Phase III trials, plaintiffs allege that the standard business practice in the biotech industry is to monitor development related to Phase III trials on a weekly basis and that Empyrean should have had regular meetings with IBC and Parexel to review clinical data. However, as set forth above, plaintiffs fail to provide any basis for their belief that the Brazilian Phase III trials never commenced. Plaintiffs also fail to set forth any factual basis for their conclusion that Empyrean did not monitor the Brazilian trials.[6]

Plaintiffs do allege, however, that Empyrean learned that a company controlled by IBC's president was under investigation for securities fraud in as early as 2000 and that Empyrean directors responded to subpoenas issued by the SEC on the issue. Although the Court finds that this allegation contains sufficient particularity, it is insufficient in and of itself to create 'a strong inference' of scienter with respect to statements made concerning the Phase III trials conducted by IBC. In sum, the Court finds that the Complaint fails to create a "strong inference" of scienter as required under Section (b)(2).[7]

## C. Reliance

 In order to succeed on a 10(b)/Rule 10b–5 claim, a plaintiff must plead and prove reliance. "Under certain circumstances, plaintiffs can satisfy this element by raising a rebuttable presumption of reliance." *Freeman v. Laventhol & Horwath*, 915 F.2d 193 (6th Cir.1990), *citing Basic, Inc. v. Levinson*, 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). The fraud on the market theory is one such presumption. In *Freeman*, the Sixth Circuit held,

> One of the circumstances justifying a presumption of reliance arises when a plaintiff alleges that a defendant made material misrepresentations or omissions concerning a security that is actively traded on an efficient market, thereby establishing fraud on the market. The fraud on the market theory rests on the assumption that the price of an actively traded security in an open, well-developed, and efficient market re-

---

**6.** The Court notes again that the PSLRA's heightened pleading standard requires that plaintiffs articulate the factual basis supporting the reasons plaintiffs believe that the alleged misrepresentations are false. Plaintiffs statement that "no Phase III trials were commenced in Brazil" is simply a conclusory assertion that the statement made by Empyrean is false. The Court finds no difference between plaintiffs' statement and a simple allegation stating that "the statement is false." The same holds true with respect to plaintiffs' claim that Empyrean failed to monitor the testing in Brazil. Plaintiffs fail to provide any factual support for either of these contentions and, accordingly, this Court finds that plaintiffs cannot rely on these allegations to establish scienter.

**7.** Defendants point out that plaintiffs fail to allege any motive on the part of the defendants with respect to the alleged fraud. While plaintiffs are correct that motive is not per se required, "motive type" allegations are among the factors listed in *Helwig* as relevant to a determination of whether a 'strong inference' of scienter is alleged.

flects all the available information about the value of a company.... Investors rely on the price of the security as an accurate reflection of its worth. They, therefore, rely indirectly on such misrepresentations, even if they do not rely on them directly.

*Freeman,* 915 F.2d at 197 (citations omitted).

Defendants claim that plaintiffs are not entitled to rely on a fraud on the market theory in order to plead reliance because Empyrean's stock is not traded on an efficient market and any misstatement made by defendants was not "material." Plaintiffs disagree.

■ In order to invoke the fraud on the market theory of reliance, a plaintiff must allege and prove the following,

(1) that the defendants made public misrepresentations,

(2) that the misrepresentations were material,

(3) that the stock was traded on an efficient market,

(4) that the misrepresentations would induce a reasonable, relying investor to misjudge the value of the stock, and

(5) that the plaintiff traded in the stock between the time the misrepresentations were made and the time the truth was revealed.

*Id.* at 198.

Defendants claim that because Empyrean's stock was traded on the over the counter market (hereafter "OTC"), plaintiffs are not entitled to the fraud on the market presumption. According to defendants, the OTC market is not an efficient market. In the alternative, defendants argue that since Empyrean stock traded on the OTC market, plaintiffs should be required to plead specific facts demonstrating that the stock traded on an efficient market. Plaintiffs argue that the OTC market is not per se inefficient and further claim that the Complaint contains facts sufficient to invoke the fraud on the market presumption of reliance.

■ As an initial matter, this Court declines to create a bright line rule establishing that the OTC market is per se inefficient. Rather, the "question is always whether the stock trades in an efficient market, i.e., one in which material information on the company is widely available and accurately reflected in the value of the stock." *See Harman v. LyphoMed, Inc.,* 122 F.R.D. 522 (N.D.Ill.1988). The Sixth Circuit has identified five factors useful in determining whether a particular security is traded in an efficient market. These factors are, "(1) a large weekly trading volume; (2) the existence of a significant number of reports by securities analysts; (3) the existence of market makers and arbitrageurs in the security; (4) the eligibility of the company to file an S–3 Registration Statement; and (5) a history of immediate movement of the stock price caused by unexpected corporate events or financial releases." *Freeman,* 915 F.2d at 199.

■ Based on an application of the factors set forth in *Freeman,* the Court finds that plaintiffs sufficiently allege that Empyrean stock was traded on an efficient market during the class period. Specifically, plaintiffs allege that more than 100,-000 [8] shares of Empyrean stock were

---

**8.** Defendants argue that this number is overinflated because volume figures reported by NASDAQ double count certain sales. In response, plaintiffs ask this Court to take judicial notice of the fact that NASDAQ reported a weekly trading volume of 850,000 shares, which is greater than the 1% of outstanding threshold defendants claim is required to establish a "large trading volume." This Court finds that on the face of the Complaint, plaintiffs sufficiently *allege* a large trading volume.

bought and sold on a daily basis and that several active market makers existed with respect to Empyrean stock. (Compl.¶ 128.) In addition, plaintiffs allege that Empyrean filed a Form S–3 Registration Statement during the class period. This allegation is particularly relevant in analyzing whether an efficient market exists because Form S–3 Registration Statements are required only from "corporations whose stocks are actively traded and widely followed."[9] *Harman,* 122 F.R.D. at 525. *See also Cammer v. Bloom,* 711 F.Supp. 1264, 1277 (D.N.J.1989)("...companies entitled to issue new securities using SEC Form S–3 would almost by definition involve stocks trading in an "open and developed" market...."). Although the PSLRA heightens the pleading standard for Section 10(b) claims, this Court notes that plaintiffs need not *prove* that the market is efficient at the pleading stage. Rather, plaintiffs need only properly *plead* that Empyrean stock traded on an efficient market. This Court finds that the Complaint sufficiently alleges[10] that Empyrean stock traded on an efficient market.

## 2. The Safe–Harbor Provision

In addition to heightening the pleading standard in securities fraud cases, Congress created the safe-harbor provision, which exempts "forward looking statements" from liability.

Based on the judicial 'bespeaks caution' doctrine, this provision excuses liability for defendants' projections, statements of plans and objectives, and estimates of future economic performance. A plaintiff may overcome this protection only if the statement was material; if defendants had actual knowledge that it was false or misleading; and if the statement was not identified as 'forward-looking' or lacked meaningful cautionary language.

*Helwig,* 251 F.3d 540 (6th Cir.2001) (*citing* 15 U.S.C. § 78u–5(i)(1)).

Defendants argue that certain statements made by Empyrean are not actionable because they are statements of

---

The Court will not entertain a fact intensive analysis of the precise trading volume of Empyrean stock at this point in the litigation.

9. Plaintiffs suggest that the Court may take judicial notice of certain facts, i.e., the average trading volume and the NASDAQ OTC Bulletin Boards. Because this Court finds that plaintiffs' Complaint adequately alleges fraud on the market even absent these factual allegations, this Court declines to take judicial notice at this time. However, given that plaintiffs must amend their complaint on other grounds, the Court notes that plaintiffs may wish to include these factual allegations in their Second Amended Complaint, thus avoiding the need for judicial notice at later stages in the litigation.

10. Defendants claim that plaintiffs cannot invoke the fraud on the market theory because plaintiffs fail to allege that the price of Empyrean stock fell immediately following the December 2001 press releases concerning the status of the Brazilian Phase III. Defendants' argument appears to rely on the assumption

that disclosure of the information contained in the December 2001 press releases would *necessarily* cause a drop in price in an efficient market. Plaintiffs respond that the press releases do not contain negative information. These arguments directly contradict the positions taken by the parties with respect to scienter. In arguing scienter, plaintiffs point to the December 2001 press releases as evidence that earlier statements concerning the Brazilian Phase III testing are false. On the other hand, defendants argue that the press releases do not render earlier statements made by Empyrean false or misleading. As set forth above, this Court finds that the press releases in and of themselves do not convey information that directly contradicts earlier statements made by Empyrean concerning Brazilian Phase III testing. Accordingly, this Court finds that plaintiffs' failure to allege that the price fell after disclosure does not require a finding that the market is inefficient.

optimism. Defendants also claim that statements concerning the Phase III trials and introduction of GEDA–Plus into the marketplace "bespeak caution" and are protected by the safe-harbor provision in the Securities Act. Plaintiffs claim that the statements identified by defendants are statements of current or historical fact and, accordingly, do not fall within the safe-harbor provision. Plaintiffs further claim that even if certain statements are "forward-looking," defendants made those statements with actual intent to deceive, thereby removing the protection afforded under the safe-harbor provision in the PSLRA.

This Court must first decide whether certain statements identified by the defendants are "forward-looking." If so, the statements are afforded protection from liability under the safe harbor provision. Plaintiffs, however, may overcome this protection by satisfying the three-part test set forth in *Helwig*.

According to the defendants, the following statements are exempt from liability,[11]

- "It is anticipated that the Phase III trials will begin in 1999."
- Empyrean believes that the anti-microbial vaginal contraceptive gel...could reach the market much faster and be the first such product available for sale.
- The Company is hopeful that the [IND] application will be formally submitted to the FDA in 2001.

- Funding from Laurus will "allow us to continue our aggressive program" and "provide us with staying power as we plan the worldwide introduction" of GEDA–Plus.
- Phase III trials will determine the effectiveness of GEDA–Plus in preventing the five most common sexually transmitted diseases.

In addition, defendants claim that "statements about Empyrean's plans to commence Phase III trials [12] and introduce GEDA–Plus the marketplace" are exempt from liability.

The PSLRA defines "forward looking statement" as,

\* \* \* \* \* \*

(B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;

\* \* \* \* \* \*

(D) any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B), or (C);

\* \* \* \* \* \*

15 U.S.C. § 78u–5(i)(1).

■■■ Based on subpart (B), the Court finds that the statements identified by defendants in the bullet points above are "forward-looking" within the meaning of

---

**11.** The Court notes that the defendants argue what appears to be three separate bases for non-liability. Specifically, defendants argue that certain statements are forward looking, "bespeak caution" or are protected by the safe harbor provision. The Court finds, however, that pursuant to *Helwig*, defendants' arguments are more properly analyzed under the safe harbor provision of the PSLRA, which was intended to encompass the other bases for non-liability asserted by the defendants.

**12.** It is not clear which specific statements defendants refer to with respect to Empyrean's "plans to commence Phase III trials," other than the statement identified in the bullet points. This Court makes no determination as to whether any statements concerning Phase III testing other than those specifically identified by defendants are "forward looking."

the PSLRA. Each of the statements indicates a future objective or plan with respect to GEDA–Plus, the truth of which cannot be tested as of the time the statement was made. *See In re Champion Enters., Inc. Sec. Litig.*, 144 F.Supp.2d 848, 861 (E.D.Mich.2001)(*citing Harris v. Ivax*, 182 F.3d 799, 805 (11th Cir.1999)). Accordingly, the Court finds that the specific statements set forth above are forward looking statements, which are afforded protection by the safe harbor provision in the PSLRA.

In order to deprive a particular statement from the protection afforded under the safe harbor provision, plaintiffs must demonstrate that the statement was material, defendants had actual knowledge that the statement was false or misleading when made and that the statement was not identified as 'forward-looking' or lacked meaningful cautionary language. *Helwig*, 251 F.3d 540 (6th Cir.2001) (citing 15 U.S.C. § 78u–5(i)(1)).

 As defendants point out, certain statements identified above were identified as forward-looking in the relevant press releases, which also contained cautionary language indicating that the statements were predictions subject to uncertainty. Empyrean further indicated that the actual results may vary markedly from those set forth in the statements. Moreover, plaintiffs fail to allege facts indicating that the statements were made with the actual intent to deceive.[13] Plaintiffs' conclusory allegation that defendants knew that the statements were false falls far short of satisfying the heightened pleading

standard required under the PSLRA. Accordingly, the Court finds that plaintiffs fail to allege sufficient facts to overcome the presumption that the specific bullet-point statements identified above [14] are entitled to protection under the safe harbor provision. As such, these statements cannot form the basis of plaintiffs' claim for securities fraud.

### Count Three (Section 11)

 Defendants claim that count three should be dismissed because the January 2001 S–4 Registration Statement (hereafter "January S–4 Statement") is not actionable. Because the January S–4 Registration Statement simply effected a change in corporate domicile through a merger, which called for a one for one exchange of Empyrean–Wyoming stock for Empyrean–Delaware stock, no "new investment decision" was involved. Accordingly, plaintiffs do not have standing to assert a Section 11 claim.

Plaintiffs claim that Section 11 liability may be premised on the January S–4 Statement [15] because even if Empyrean was not required to file the January S–4 Registration Statement, by voluntarily filing it, Empyrean subjected itself to Section 11 liability. Plaintiffs further ague that even if the initial recipients of Empyrean–Delaware stock lack standing, subsequent purchasers may assert a Section 11 claim.

Section 11(a), 15 U.S.C. § 77k, creates a cause of action based on false statements made in effective registration statements. That section provides,

---

**13.** Unlike scienter, which may be demonstrated by properly alleging recklessness, to overcome the protection afforded under the safe harbor provision, a plaintiff must properly plead actual intent.

**14.** The Court makes no determination with respect to any other allegedly fraudulent statement contained in the Complaint.

**15.** The Court notes that the Complaint alleges that Section 11 liability may be premised on the July 30, 1999 Registration Statement and each subsequent amendment. In their brief in opposition, however, plaintiffs concede that only the January S–4 Registration Statement may form the basis for liability. Accordingly, only that statement is analyzed by the Court.

In case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact... *any person acquiring such security* ...may either at law or in equity, in any court of competent jurisdiction [bring an action against the culpable parties].

15 U.S.C. § 77k(a) (emphasis added).

Thus, in order to have standing to assert a violation of Section 11, a plaintiff must have "acquired" the security. The term "acquiring such security" has been limited to "purchasers of shares issued and sold pursuant to the challenged registration statement." *See 7547 Corp. v. Parker & Parsley Dev. Partners*, 38 F.3d 211 (5th Cir.1994). *See also Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 735–36, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). Thus, this Court must determine whether the stock exchange based on the January S–4 Registration Statement involved the purchase and sale of Empyrean securities.

It is well settled that certain stock exchanges are considered "sales" for purposes of Section 11. *See 7547 Corp.*, 38 F.3d at 223. The regulations governing Section 11 specifically include certain reclassifications, mergers/consolidations and asset transfers as involving an "offer, offer to sell, offer for sale, or sale." 17 C.F.R. § 230.145(a)(1)-(3). However, mergers or consolidations where "the sole purpose of the transaction is to change the issuer's domicile solely within the United States" are exempt from the definition of sale. 17 C.F.R. § 230.145(a)(2).

Defendants claim that the sole purpose of the January S–4 Registration Statement was to change Empyrean's corporate domicile from Wyoming to Delaware. Plaintiffs do not dispute that the purpose of the filing was to effect this change, and the Court's own review of the January S–4 Registration Statement supports such a finding. Accordingly, because the S–4 Registration Statement was filed solely to change Empyrean's corporate domicile, no "sale" occurred. As a result, plaintiffs receiving an exchange of Empyrean–Wyoming stock for Empyrean–Delaware stock did not "acquire" stock for purposes of Section 11 liability and these plaintiffs have no standing to assert a claim under Section 11.

The Court also rejects the contention that aftermarket purchasers of Empyrean stock subsequent to January 2001 have standing to assert a Section 11 claim. Plaintiffs correctly point out that several courts have held that an aftermarket purchaser has standing to assert a Section 11 violation, provided the stock is traceable to the effective registration statement. *Lee v. Ernst & Young*, 294 F.3d 969 (8th Cir. 2002); *Joseph v. Wiles*, 223 F.3d 1155 (10th Cir.2000); *Hertzberg v. Dignity Partners, Inc.*, 191 F.3d 1076 (9th Cir. 1999).

As defendants point out, the cases cited by plaintiffs do not address the specific issue before this Court. This Court must decide whether an aftermarket purchaser acquiring stock from an individual, who himself did not acquire the stock based on the registration statement, has standing to assert a Section 11 claim. It appears this issue is one of first impression. As set forth above, because the January S–4 Registration Statement did not constitute a sale, the initial recipients of Empyrean–Delaware stock cannot assert a Section 11 violation. To adopt plaintiffs' position would result in a peculiar situation, in that *only* aftermarket purchasers would have standing to assert a violation, even though the aftermarket purchase is not traceable to a registration statement governing any "sale" by Empyrean. This Court rejects plaintiffs' position and finds that because the January S–4 Registration Statement did not involve a "sale" of securities, no

shares can be traced back to that statement. Accordingly, Count III is dismissed with prejudice.[16]

**Counts Two and Four (Control Person Liability)**

Because the Complaint fails to properly allege that Empyrean violated any provision of the Securities Act, plaintiffs fail to allege that the Individual Defendants are liable as "controlling persons." Accordingly, counts two and four are dismissed without prejudice.

*CONCLUSION*

For the forgoing reasons, defendants' Motion to Dismiss is GRANTED. Counts one, two and four are DISMISSED without prejudice with leave to amend GRANTED. Count three is DISMISSED with prejudice. To avoid dismissal of the entire case, plaintiffs must file an amended complaint within fourteen days from the date of entry of this Memorandum of Opinion and Order.

IT IS SO ORDERED.

---

**16.** Because the Court finds that plaintiffs cannot state a claim under Section 11, the Court need not reach defendants' additional argument that certain statements are "forward-looking," and thus exempt from Section 11 liability.